**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Teri Herrera, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Verra Mobility Corporation, et al.,<br><br>Defendants. | No. CV-20-00515-PHX-DWL<br><br>**ORDER** |

In this putative class action, Plaintiff Teri Herrera ("Herrera") alleges that Defendants Verra Mobility Corporation ("Verra"), ATS Processing Services, LLC ("ATS Processing"), and American Traffic Solutions Consolidated ("ATS Consolidated") (collectively, "Defendants") violated the Fair Debt Collection Practices Act ("FDCPA") and state law through their actions to collect unpaid toll charges from rental car customers. Now pending before the Court is Defendants' motion to compel arbitration and stay proceedings. (Doc. 24.) The motion is fully briefed and neither side requested oral argument. For the following reasons, the motion will be granted.

**BACKGROUND**

I.  Underlying Facts

In October 2019, Herrera rented a car from Thrifty Car Rental ("Thrifty") in Florida. (Doc. 12 ¶ 32.) Thrifty required her to pay the toll charges she incurred while driving the rental car. (*Id.* ¶ 33.) Herrera had two options for paying the tolls: (1) purchase

"PlatePass," which covered all toll charges incurred; or (2) pay each toll charge directly. (*Id.*) If Herrera chose the latter option but failed to pay any toll charges directly, she would be charged for the tolls plus an administrative fee. (*Id.*) Herrera "chose to forgo the PlatePass option and to pay tolls directly." (*Id.*) While in Florida, Herrera failed to pay "at least fourteen tolls," totaling $20.98. (*Id.* ¶ 36.)

In February 2020, Herrera rented a car from Fox Rent A Car ("Fox") in California. (*Id.* ¶ 50.) Herrera again declined to purchase PlatePass and agreed to pay any toll charges directly. (*Id.*) Herrera ultimately failed to pay toll charges totaling $7.00. (*Id.* ¶ 51.)

Thrifty and Fox contract with Defendants to recover unpaid tolls incurred by customers. (*Id.* ¶¶ 18-20.) Pursuant to those contracts, Defendants attempted to collect Herrera's unpaid toll charges, along with administrative fees. (*Id.* ¶¶ 37-41, 52-58.) Defendants charged $150.25 on Herrera's credit card for the Thrifty transaction. (*Id.* ¶ 49.)

II.     The Arbitration Agreements

    A.    **Thrifty**

Herrera's contract with Thrifty contained an arbitration clause (the "Thrifty Agreement") that provides in relevant part as follows:

> Except for claims for property damage, personal injury or death, any disputes between You and us ("us" and "we" for the purposes of this Arbitration Provision means Thrifty Car Rental, ("Thrifty") its parent and affiliate corporations, and their respective officers, directors and employees and any vendor or third party providing services for this rental transaction) must be resolved only by arbitration or in a small claims court on an individual basis; class arbitrations and class actions are not allowed. You and we each waive the right to a trial by jury or to participate in a class action, either as a class representative or class member. You and we remain free to bring any issues to the attention of government agencies.
>
> This Arbitration Provision's scope is broad and includes, without limitation, any claims arising from or relating to this Agreement or any aspect of the relationship or communications between us, whether based in contract, tort, statute, fraud, misrepresentation, equity, or any other legal theory. It is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.
>
> In any arbitration under this Arbitration Provision, all issues are for the arbitrator to decide, including his or her own jurisdiction, and any objections with respect to the existence, scope or validity of this Arbitration

> Provision. . . .   The American Arbitration Association ("AAA") will administer any arbitration pursuant to its Consumer Arbitration Rules.

(Doc. 24 at 23, capitalization omitted.)  Additionally, the portion of the contract describing the PlatePass program stated in relevant part that "[i]f you decline the optional PlatePass All-Inclusive Service at the commencement of the rental, you will be liable for, and we will charge you: (a) all tolls incurred . . . ; (b) a $9.99 administrative fee for each toll incurred . . . ; and (c) all other applicable toll charges or fees, if any. . . .  You authorize us to release your rental and payment card information to PlatePass LLC, ATS Processing Services, LLC and American Traffic Solutions, Inc. (collectively, 'ATS') for processing and billing purposes.  If we or ATS pay a toll or citation on your behalf . . . you authorize us or ATS to charge all such payments and related administrative fees . . . to the credit card . . . used for this rental."  (*Id.* at 22.)

B.   **Fox**

Herrera's contract with Fox included an arbitration clause (the "Fox Agreement") that provides as follows:

> Except for claims for property damage, personal injury, or death, any disputes between or amongst Renter, Fox Rent A Car, Inc., ATS Processing Services, LLC, PlatePass, LLC, and each of their respective affiliates must be resolved only by arbitration or in a small claims court on an individual basis; class arbitrations and class actions are not allowed.  Renter and Fox waive the right to a trial by jury or to participate in a class action either as a class representative or a class member.  Renter and FOX remain free to bring any issues to the attention of government agencies.  This Arbitration Provision's scope is broad and includes without limitation, any claims relating to any aspect of the relationship between Renter and Fox.  In any arbitration, all issues are for the arbitrator to decide, including jurisdiction, and any objections with respect to the existence, scope, or validity of this Arbitration Provision.  The arbitration will take place in the county of Renter's billing address unless otherwise agreed.  The American Arbitration Association will administer any arbitration pursuant to its Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer-Related Disputes.

(*Id.* at 27, capitalization omitted).

…

**DISCUSSION**

I.  Legal Standard

The Federal Arbitration Act ("FAA") applies to contracts "evidencing a transaction involving commerce." 9 U.S.C. § 2. It provides that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* Thus, absent a valid contractual defense, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis omitted).

In general, a district court's role under the FAA is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). These two issues are sometimes referred to as the "gateway" questions of arbitrability. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). Although the gateway questions are ordinarily resolved by the court, parties may agree to arbitrate one or both of the gateway issues by including a delegation clause in the arbitration agreement: "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id.* at 70. The evidence of the parties' intent to delegate such issues to the arbitrator must be "clear and unmistakable." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).

To the extent the first gateway issue has not been delegated, courts look to state law to determine whether a valid agreement to arbitrate exists. *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1093 (9th Cir. 2014). *See also Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 846 (6th Cir. 2020) (noting that although "questions of contract formation and interpretation . . . generally involve state law . . . the question whether a particular agreement satisfies the 'clear and unmistakable' standard . . . seems to be one of federal

law") (citing *Brennan*, 796 F.3d at 1128-30). Here, the parties agree the Thrifty Agreement is governed by Florida law and the Fox Agreement is governed by California law.

II.   Analysis

In many cases, disputes over arbitrability turn on whether the arbitration agreement is unconscionable or whether the plaintiff's claims fall within the scope of the agreement. Those issues aren't disputed here. Instead, the parties' disagreement turns on the related questions of (1) whether each Defendant has standing to enforce the arbitration clauses appearing within the Thrifty and Fox contracts and (2) whether this Court or an arbitrator should be the one to resolve the standing issue. Because the resolution of these issues is Defendant- and contract-specific, they are broken into various sub-categories below.

A.   **Thrifty Agreement**

As noted, the Thrifty Agreement provides that "any disputes between You and us ('us' and 'we' for the purposes of this Arbitration Provision means Thrifty Car Rental, ('Thrifty') its parent and affiliate corporations, and their respective officers, directors and employees and any vendor or third party providing services for this rental transaction) must be resolved only by arbitration or in a small claims court on an individual basis." (Doc. 24 at 23, capitalization omitted.) The Thrifty Agreement also contains a delegation clause providing that (1) "all issues are for the arbitrator to decide, including his or her own jurisdiction, and any objections with respect to the existence, scope or validity of this Arbitration Provision" and (2) "[t]he American Arbitration Association ('AAA') will administer any arbitration pursuant to its Consumer Arbitration Rules." (*Id.* at 23.) Finally, the portion of the Thrifty contract describing the PlatePass program states in relevant part that "[i]f you decline the optional PlatePass All-Inclusive Service at the commencement of the rental, you will be liable for, and we will charge you: (a) all tolls incurred . . . ; (b) a $9.99 administrative fee for each toll incurred . . . ; and (c) all other applicable toll charges or fees, if any. . . . You authorize us to release your rental and payment card information to PlatePass LLC, ATS Processing Services, LLC and American Traffic Solutions, Inc. (collectively, 'ATS') for processing and billing purposes. If we or ATS pay a toll or a

citation on your behalf . . . you authorize us or ATS to charge all such payments . . . to the credit card . . . you used for this rental." (*Id.* at 22.)

As discussed below, the parties advance somewhat different arguments concerning whether ATS Processing and ATS Consolidated, on the one hand, and Verra, on the other, may compel arbitration under the Thrifty Agreement.

1. <u>ATS Processing And ATS Consolidated</u>

Defendants contend that because Herrera "'clearly and unmistakably' agreed to delegate gateway issues of arbitrability to the arbitrator," this Court should "compel [Herrera] to arbitrate her claims—including any disputes regarding arbitrability—in Arizona." (Doc. 24 at 7-9.) Alternatively, Defendants argue that, on the merits, ATS Processing and ATS Consolidated may enforce the Thrifty Agreement because they qualify as parties to (or, at a minimum, third-party beneficiaries under) that agreement. (*Id.* at 10-11.) Herrera disagrees with all of these points—she argues that "the question of delegation is inapposite until Defendants establish their right to invoke the arbitration agreements" (Doc. 27 at 5-7) and that ATS Processing and ATS Consolidated aren't parties or third-party beneficiaries because they are "non-signatories" and because she declined PlatePass (*id.* at 4-5, 12-16).

There is a strong argument that the delegation provision within the Thrifty Agreement requires the arbitrator, rather than this Court, to resolve the gateway issue of whether ATS Processing or ATS Consolidated have standing to compel Herrera to arbitrate her claims against them. In *Brennan*, the Ninth Circuit held that the "incorporation of the AAA rules" in an arbitration agreement may alone "constitute[] 'clear and unmistakable' evidence that the parties intended to delegate the arbitrability question to an arbitrator." 796 F.3d at 1130. The Thrifty Agreement not only incorporates the AAA rules but also expressly states that "all issues are for the arbitrator to decide, including his or her own jurisdiction, and any objections with respect to the existence, scope or validity of this Arbitration Provision." (Doc. 24 at 23.) The presence of this additional language suggests that the Thrifty Agreement provides even clearer and more unmistakable evidence of intent

to delegate the issue of arbitrability than the agreement in *Brennan*, which was deemed enforceable.[1]

Herrera seeks to distinguish *Brennan* by arguing that "both the plaintiff and defendant in [that case] were signatories to the contract at issue," whereas in this case, "Defendants are not signatories to either of Plaintiffs' rental car contracts." (Doc. 27 at 4-5 & n.1.) An initial problem with this argument—which blends together the question of delegation with the merits of the standing issue—is that the concept of "signatories" is something of a red herring here. The only party to affix a signature on the Thrifty Agreement was Herrera. (Doc. 24 at 24.) It was not signed by a Thrifty representative. Thus, to determine the identify of Herrera's contractual counterparty (or counterparties), it is necessary to go beyond a mere examination of the signature block. *Cf. Dorward v. Macy's, Inc.*, 2011 WL 2893118, *8 (M.D. Fla. 2011) ("Under both the Federal Arbitration Act and the Florida Arbitration Code, an arbitration agreement need not be signed to be enforceable.") (citations omitted).

Under Florida law, "[c]ontract interpretation begins with a review of the plain language of the agreement because the contract language is the best evidence of the parties' intent at the time of the execution of the contract." *Hirsch v. Jupiter Golf Club LLC*, 232 F. Supp. 3d 1243, 1252 (S.D. Fla. 2017). Likewise, under federal law, "the intent of the parties must be ascertained from the contract itself" and, "[w]henever possible, the plain language of the contract should be considered first." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999). The Thrifty Agreement expressly defines the term "Thrifty" as encompassing not only Thrifty Car Rental but also certain other entities and individuals, including "any vendor or third party providing services for this rental transaction." (Doc. 24 at 23.) In the Court's view, ATS Processing and ATS

---

[1] Although the *Brennan* court stated that "we limit our holding to the facts of the present case, which . . . involve an arbitration agreement between sophisticated parties," the court also emphasized that "[o]ur holding today should not be interpreted to require that the contracting parties be sophisticated or that the contract be commercial before a court may conclude that incorporation of the AAA rules constitutes 'clear and unmistakable' evidence of the parties' intent." *Id.* at 1130-31 (internal quotation marks omitted).

Consolidated clearly and unmistakably qualify as "vendor[s] and third part[ies] providing services for this rental transaction." Although Herrera declined to use PlatePass, the contractual definition of "us" isn't limited to vendors and third parties providing services to the *customer*. It also extends to vendors and third parties providing services to *Thrifty* concerning the rental transaction. The contract specifically identifies ATS Processing and ATS Consolidated as entities that would be providing such services to Thrifty, by paying tolls and citations incurred by customers. (*Id.* at 22.)

Herrera also argues that *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122 (9th Cir. 2013), supports her position. In *Kramer*, the plaintiffs were vehicle purchasers who signed contracts "with their respective dealerships" that contained arbitration agreements. *Id.* at 1124. Toyota, in contrast, was "not a signatory to any of the" agreements. *Id.* at 1125. Later, after the plaintiffs sued Toyota in a class action, Toyota moved to compel arbitration and argued, among other things, that the district court lacked jurisdiction to decide whether it had standing to compel arbitration due to the presence of a delegation clause. *Id.* at 1127 ("Toyota argues that because the [agreements] expressly provide that the arbitrator shall decide issues of interpretation, scope, and applicability of the arbitration provision, the arbitrator should decide the issue of whether a nonsignatory may compel Plaintiffs to arbitrate."). The district court rejected this argument, finding that it had authority to address Toyota's standing to compel arbitration, and the Ninth Circuit affirmed. *Id.* at 1127-28. When doing so, however, the Ninth Circuit didn't announce a blanket rule that questions concerning a non-signatory's ability to compel arbitration must always be resolved by the court. To the contrary, the Ninth Circuit's fact-specific ruling was that "because the arbitration clause is limited to claims between 'you and us'—i.e. Plaintiffs and the Dealerships," "[t]he language of the contracts . . . evidences Plaintiffs' intent to arbitrate arbitrability with the Dealerships and no one else." *Id.* Put another way, because "the terms of the arbitration clauses are expressly limited to Plaintiffs and the Dealerships," there was no "clear and unmistakable evidence that Plaintiffs agreed to arbitrate arbitrability with nonsignatories" such as Toyota. *Id.*

The key difference between *Kramer* and this case lies in the contractual language. In *Kramer*, the arbitration clause narrowly defined "us" as the dealership. This approach necessarily (if implicitly) excluded the manufacturer, Toyota. Here, the arbitration clause broadly defines "us" as not only Thrifty, but also the vendors and third parties providing services to Thrifty as part of the rental transaction. Thus, although the contractual language in *Kramer* may not have provided "clear and unmistakable evidence that Plaintiffs agreed to arbitrate arbitrability with" Toyota, *id.* at 1127, the contractual language in this case does provide clear and unmistakable evidence of such intent with respect to ATS Processing and ATS Consolidated.

In *Banh v. Am. Honda Motor Co., Inc.*, 2020 WL 5035095 (C.D. Cal. 2020), the court confronted similar issues. There, the plaintiffs signed two different categories of contracts with Acura. Both contained arbitration agreements with delegation clauses. *Id.* at *5. Additionally, in the first set of contracts, "Acura [was] defined to include Honda," but the second set of contracts did "not define Acura to include Honda." *Id.* After the plaintiffs sued Honda in a class action, Honda moved to compel arbitration and argued that the parties had "delegate[d] the threshold issue of . . . standing to an arbitrator." *Id.* In response, the plaintiffs argued that Honda's status as a non-signatory precluded it from invoking the delegation clauses in either contract. *Id.* Notably, the court held that Honda could invoke the delegation clauses as to claims arising under the first set of contracts, because Honda was "expressly included in the definition of Acura" in those contracts, but could not invoke the delegation clauses as to claims arising under the second set of contracts. *Id.* Here, because the Thrifty Agreement expressly defined "us" as encompassing vendors and third parties providing rental-related services (and then specifically identified ATS Processing and ATS Consolidated as two such service providers), it follows that ATS Processing and ATS Consolidated "may invoke the right to the benefits of the arbitration agreements—namely, the delegation provisions." *Id.*

Finally, even if Herrera hadn't agreed to delegate questions of arbitrability pertaining to ATS Processing and ATS Consolidated, the Court would grant their motion

because it concludes they do, in fact, have standing to compel arbitration. As noted, Herrera's primary argument is that ATS Processing's and ATS Consolidated's status as "non-signatories" means they don't qualify as parties or third-party beneficiaries to the Thrifty Agreement, but this argument is not supported by Florida law and is undermined by the plain language of the contract itself, which defines "us" as encompassing vendors and third-party service providers and specifically identifies ATS Processing and ATS Consolidated as two such service providers. *See generally Henderson v. Idowu*, 828 So.2d 451, 452-53 (Fla. Dist. Ct. App. 2002) ("Notwithstanding appellant is a non-signatory to the arbitration agreement, she is entitled to its benefits if she is a third party beneficiary. The arbitration agreement here . . . was expressly intended to benefit an identified class of persons, i.e.*,* an employee of Tenet or one of its affiliated companies or entities. Appellant fell within the identified class and, thus, she may benefit from the agreement as a third-party beneficiary.") (footnote omitted).[2]

        2.     <u>Verra</u>

In their motion, Defendants seem to argue that Herrera's Thrifty-related claims against Verra must be arbitrated for the same reasons as her Thrifty-related claims against ATS Processing and ATS Consolidated. (Doc. 24.) Herrera responds that Verra's arbitration demand fails because (1) Verra's name isn't mentioned anywhere in the Thrifty contract, and (2) Defendants have admitted in several filings in this case (and during email correspondence between counsel) that Verra isn't an "affiliate" of Thrifty, ATS Processing,

---

[2] Herrera notes (Doc. 27 at 5-6) that the Court previously addressed whether a non-signatory was *bound* by an arbitration agreement, such that a signatory could compel arbitration, *Canady v. Bridgecrest Acceptance Corp.*, 2020 WL 1952566 (D. Ariz. 2020), but the question whether a non-signatory may enforce an arbitration agreement against a signatory is different. *Blanton,* 962 F.3d at 848-49 ("This court has treated the non-signatory question differently when the non-signatory opposes arbitration.") (emphasis omitted); *Mobile Real Est., LLC v. NewPoint Media Grp., LLC*, 460 F. Supp. 3d 457, 479 (S.D.N.Y. 2020) ("While issues of arbitrability with respect to non-signatories seeking to compel arbitration may be delegated to an arbitrator, the issue of whether a non-signatory may be compelled to arbitrate is for the Court to decide."). For this reason, Herrera's reliance on *Benaroya v. Willis*, 23 Cal.App.5th 462 (2018), is misplaced. There, the court addressed whether a signatory could compel a non-signatory to participate in arbitration, not the reverse. *Id.* at 467 (agreeing that the "decision whether a nonsignatory to an arbitration agreement can be compelled to arbitrate is a matter solely within the authority of the trial court, not the arbitrator").

or ATS Consolidated and had no role in the rental transaction. (Doc. 27 at 11-12.) In reply, Defendants argue, *inter alia*, that Herrera "is equitably estopped from attempting to split apart her claims against Defendants to undermine arbitration." (Doc. 28 at 10-11.)

The Court agrees that Herrera is equitably estopped from challenging Verra's arbitration demand.[3] Under Florida law, a non-signatory may compel arbitration when, *inter alia*, "there are allegations of concerted action by both a nonsignatory and one or more of the signatories to the contract." *Allscripts Healthcare Sols., Inc. v. Pain Clinic of Nw. Fla., Inc.*, 158 So.3d 644, 646 (Fla. Dist. Ct. App. 2014) (internal quotation marks omitted).[4] *See also Armas v. Prudential Sec., Inc.*, 842 So.2d 210, 212 (Fla. Dist. Ct. App. 2003) ("Non-signatories can . . . compel arbitration based on the equitable estoppel doctrine. Equitable estoppel is warranted when the signatory to the contract containing the arbitration clause raises allegations of concerted conduct by both the non-signatory and one or more of the signatories to the contract.") (citation omitted).

Here, the FAC alleges concerted action by Verra, ATS Processing, and ATS Consolidated. Most of the allegations are directed to Verra, ATS Processing, and ATS Consolidated collectively. (Doc. 12 at 2 [referring to the three Defendants "collectively" as "the Verra Mobility Defendants"].) The FAC alleges that ATS Processing and ATS Consolidated are subsidiaries of Verra but otherwise largely does not distinguish between the defendants. (*Id.* ¶ 22.) When allegations are leveled at Verra alone, most are in the context of Verra's alleged responsibility for the operations of ATS Processing and ATS Consolidated. (*Id.* ¶¶ 60-65.) The FAC further alleges that Verra had a hand in the challenged operations: "Verra . . . oversees and ensures compliance with [rental car

---

[3] Although new arguments in a reply brief are generally not permitted, the Court will consider Defendants' invocation of equitable estoppel because it responds to the arguments Herrera raised in her response. *Collaborative Continuing Educ. Council, Inc. v. Starks Realty Grp., Inc.*, 2017 WL 5714727, *1 (D. Ariz. 2017) ("Generally, this Court will not consider arguments raised for the first time in a reply. There are some exceptions to this general rule, including replies to arguments presented by opposing counsel in their response.") (citations omitted).

[4] The terms "party" and "signatory" appear to be synonymous. *Marcus v. Fla. Bagels, LLC*, 112 So.3d 631, 633 (Fla. Dist. Ct. App. 2013) (a "non-party" is also known as a "non-signatory"); *id.* at 633-34 (using terms interchangeably).

- 11 -

company] contracts," "maintains the call centers at which individuals will call," "trains and employs the individuals who work at those call centers," "hires and trains the individuals who send out" notices, and "designs and implements the software that it uses to process the tolls that rental car company customers incur." (*Id.* ¶¶ 62-65.) Indeed, the FAC lays out extensive allegations that "[t]here is such unity between the Verra Mobility Defendants that the separateness of those entities has ceased." (*Id.* at 18, emphasis omitted.)

Because Herrera has alleged concerted action between Verra, ATS Processing, and ATS Consolidated, and because Herrera's claims against ATS Processing and ATS Consolidated must be arbitrated, it follows that Herrera is equitably estopped from opposing Verra's arbitration demand. Florida courts have estopped signatories from avoiding arbitration under analogous circumstances. *See, e.g.*, *Armas,* 842 So.2d at 212 ("Prudential's claims against Dole arise out of the same factual allegations of concerted conduct by both the non-signatory . . . and the signatories . . . and equitable estoppel is warranted."); *Lash & Goldberg LLP v. Clarke*, 88 So.3d 426, 427 (Fla. Dist. Ct. App. 2012) (reversing trial court's decision to grant motion to compel arbitration as to some defendants but deny motion to compel arbitration as to defendants who weren't parties to the underlying arbitration agreement: "Even though the Lash & Goldberg defendants were not signatories or parties to the arbitration agreement, they may insist on arbitration because the complaint alleges that the defendants engaged in concerted conduct that harmed Clarke."). This outcome makes it unnecessary to address the parties' other arguments.

B. **Fox Agreement**

As noted, the Fox Agreement provides that any disputes between Herrera and Fox, ATS Processing, PlatePass, and "each of their respective affiliates must be resolved only by arbitration." (Doc. 24 at 27, capitalization omitted.) Herrera concedes that ATS Processing is a third-party beneficiary entitled to compel arbitration. (Doc. 27 at 8.) Additionally, Herrera doesn't respond to—and thus implicitly assents to—Defendants' argument that ATS Consolidated is entitled to compel arbitration.

Herrera focuses only on whether Verra is entitled to compel arbitration. (Doc. 27

1   at 7-9.) Specifically, Herrera argues that Verra is not an "affiliate" of ATS Processing or ATS Consolidated because ATS Processing's and ATS Consolidated's corporate disclosure statements in this action did not identify Verra as an affiliate. (*Id.* at 9.) Defendants reply that the corporate disclosure statements *do* identify Verra as an affiliate and that the FAC alleges that ATS Processing and ATS Consolidated are subsidiaries of Verra. (Doc. 28 at 7.) Defendants also contend that, because Herrera has alleged Verra is an alter ego of ATS Processing and ATS Consolidated, Verra is subject to the same analysis as the others. (*Id.* at 8.)

The Court agrees with Defendants that Verra can compel arbitration. Because Herrera has alleged that Verra is an "alter ego for Defendants ATS Processing Services, LLC and [ATS] Consolidated, LLC" (Doc. 12 at 16), Verra is entitled under California law to invoke the arbitration provision in the Fox Agreement to the same extent as ATS Processing and ATS Consolidated. *Rowe v. Exline*, 153 Cal.App.4th 1276, 1285 (2007) ("By suing Exline and Trahan for breach of the Agreement on the ground that they are Initiatek's alter egos . . . Exline and Trahan are entitled to the benefit of the arbitration provisions.") (internal quotation marks omitted). *See also Altela Inc. v. Ariz. Sci. & Tech. Enters. LLC*, 2016 WL 4539949, *7 (D. Ariz. 2016) ("It is well settled that the alter ego of a signatory . . . can enforce[] the terms of an arbitration agreement to the same extent that the signatory can.").

…
…
…
…
…
…
…
…
…

Accordingly,

**IT IS ORDERED** that Defendants' motion to compel arbitration in Arizona and stay proceedings (Doc. 24) is **granted**.[5]  This action is **stayed** pending arbitration.

**IT IS FURTHER ORDERED** that the parties file a joint notice every six months concerning the status of the arbitration proceeding and file a joint notice within 10 days of when the arbitration proceeding concludes. The first joint notice shall be filed six months from the date of this Order.

Dated this 18th day of November, 2020.

*Dominic W. Lanza*
United States District Judge

---

[5] Defendants argue that Arizona is the appropriate forum for arbitration under the FAA. (Doc. 24 at 13.) Herrera does not dispute this claim, and the Court agrees. *Textile Unlimited, Inc. v. ABMH & Co.*, 240 F.3d 781, 785 (9th Cir. 2001) ("[B]y its terms, § 4 only confines the arbitration to the district in which the petition to compel is filed.") (emphasis omitted).